# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | |
|---|---|
| CATHERINE W. WEBER<br>*Plaintiff,*<br><br>v.<br><br>LIFE INSURANCE COMPANY OF NORTH AMERICA,<br>*Defendant.* | CASE NO. 6:11-cv-00032<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

      This action arises out of the decision by Defendant Life Insurance Company of North America ("Defendant" or "LINA") to deny benefits claimed by Plaintiff Catherine Weber ("Plaintiff" or "Ms. Weber") under two Accidental Death and Dismemberment ("AD&D") policies of insurance issued by LINA and carried by her deceased husband, Carl Weber ("Mr. Weber"). Plaintiff originally filed her complaint in this matter in the Circuit Court for the City of Lynchburg on August 10, 2011. Subsequently, on August 29, 2011, Defendant removed the case to this Court on the basis of both federal question jurisdiction and diversity jurisdiction. Plaintiff concedes that this Court has subject matter jurisdiction over her case. On November 15, 2011, Plaintiff filed a motion for declaratory judgment pursuant to Federal Rule of Civil Procedure 57. In turn, Defendant filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons that follow, I will deny Plaintiff's motion and grant Defendant's motion.

## I. Background

The factual allegations of Ms. Weber's complaint, which the court must accept as true, are as follows. Prior to his death, Mr. Weber was employed by AREVA NP, Inc. ("AREVA") in Lynchburg, Virginia. On August 21, 2010, Mr. Weber was riding as a passenger in a light-sport aircraft[1] registered to and piloted by John Milhous ("Mr. Milhous"), having taken off from a private airstrip for a pleasure flight. At approximately 6:49 P.M., the aircraft crashed in a pasture in Amherst County, killing both Mr. Weber and Mr. Milhous instantly. Mr. Weber, as an employee of AREVA, was a policyholder of two AD&D policies ("the Policies") issued by LINA. Ms. Weber claims that together, the Policies provide $250,000 in accidental death benefits payable to her as the surviving beneficiary. One policy (the "Basic" policy) was made available to Mr. Weber by AREVA paying the premium for the AD&D benefit. It provided an AD&D benefit of $150,000. The other policy (the "Supplemental" policy) had the premiums paid by a payroll deduction from Mr. Weber's salary. It provided an AD&D benefit of $100,000.

Following Mr. Weber's demise, Ms. Weber filed the requisite claim form with AREVA, requesting benefits as the surviving beneficiary under the Policies. On September 24, 2010, LINA completed its investigation and denied Ms. Weber's claim. Thereafter, Ms. Weber retained counsel to appeal LINA's denial of benefits. After an administrative review in accordance with the Policies' terms, LINA again denied Ms. Weber's request for benefits on or about March 23, 2011.[2] According to Ms. Weber, LINA's denial of benefits is based on an exclusion contained in the "Common Exclusions" sections of both policies. Specifically,

---

[1] According to Ms. Weber, a light-sport aircraft is not an ultra-light vehicle as defined by the FAA. Mem. Supp. Pl.'s Mot. Decl. J. Ex. 1.

[2] In her complaint, Ms. Weber avers that she has exhausted her administrative remedies under the provisions of the Policies.

2

Common Exclusion 6(a) states that benefits under the policy will not be paid for any "Covered Injury" or "Covered Loss" which is caused by or results from:

> 6. flight in, boarding or alighting from an Aircraft or any craft designed to fly above the Earth's surface:
>    a. except as a passenger on a regularly scheduled commercial airline;

In her complaint, Ms. Weber alleges that the remaining terms in paragraph 6 of the Common Exclusions—that is, subparagraphs (b) through (g)—render that paragraph ambiguous. Further, Ms. Weber contends that this ambiguity should be resolved against LINA, the drafter of the Policies, and in favor of coverage rather than denial of benefits. Accordingly, in her complaint, Ms. Weber seeks an order pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the language in the Common Exclusions is ambiguous and that the internal conflicts it produces be construed in favor of coverage. In that vein, Ms. Weber also seeks an order requiring LINA to pay her the AD&D benefit under each of the Policies. Finally, Ms. Weber requests an award of costs and attorney's fees. After filing an answer, LINA filed a motion for judgment on the pleadings in which it seeks an order granting judgment in its favor on the ground that coverage is unambiguously excluded under Common Exclusion 6 found in both of the Policies.

## II. Motion for Judgment on the Pleadings Standard

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) requires the Court to apply the same standard that is applied when ruling on a motion to dismiss pursuant to Rule 12(b)(6). *Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 405–06 (4th Cir. 2002); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). In considering a motion to dismiss under Rule 12(b)(6) or Rule 12(c), the Court must assume that the allegations in the non-moving party's pleadings are true and construe all facts in the light

most favorable to the non-moving party. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Legal conclusions in the guise of factual allegations, however, are not entitled to a presumption of truth. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950–51 (2009). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and quotations omitted). Thus, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

In sum, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S. Ct. at 1950 (citing *Twombly*, 550 U.S. at 556). If, after accepting all well-pleaded allegations in the plaintiff's favor, it appears that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief, a motion to dismiss— or, in this case, a motion for judgment on the pleadings—should be granted. *Edwards*, 178 F.3d at 244.

### III. Discussion

#### A. ERISA and the Applicable Standard of Review

Prior to oral argument in this matter, there was a dispute between the parties with respect to whether the Policies at issue qualify as employee welfare benefit plans and, as a result, whether they fall within the reach of the Employee Retirement Income Security Act of 1974

4

("ERISA").³  Similarly, before the hearing that was held on the parties' motions, there was disagreement about whether LINA's denial of AD&D benefits should be reviewed *de novo* or instead merely for an abuse of discretion. However, at oral argument, these two disputes became effectively moot. First, LINA retracted its argument that the denial of benefits should be reviewed under an abuse-of-discretion standard and conceded that *de novo* review was proper. Accordingly, I will review the denial *de novo*. Second, as will be discussed in further detail in the following section, it became apparent that whether ERISA applies is irrelevant because it does not change the basic rules of construction that guide my analysis of the Policies' exclusionary language.

## B. Choice of Law

As mentioned, it is ultimately irrelevant whether ERISA applies because the rules of construction that must be employed are not appreciably different.

1. If ERISA Does Not Apply

If the Policies are not governed by ERISA, state common law must be applied in order to interpret any alleged ambiguities in their language. Of course, that conclusion simply begets the question of which state's law would apply. It is well-established that the choice-of-law analysis to be applied in a given case is that of the state in which the forum court resides. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). Generally, the choice-of-law doctrine in Virginia provides that "where parties to a contract have expressly declared that the agreement shall be construed as made with reference to the law of a particular jurisdiction, [the courts] will recognize such agreement and enforce it, applying the law of the stipulated jurisdiction." *Paul Business Sys., Inc. v. Canon USA, Inc.*, 240 Va. 337, 342, 397 S.E.2d 804, 807 (1990). In the

---

³ Ms. Weber conceded in the memorandum accompanying her motion that the Basic policy qualifies as an ERISA plan; however, she contended that the Supplemental policy is not an employee welfare benefit plan and thus not governed by ERISA. Mem. Supp. Pl.'s Mot. Decl. J. 12–13.

5

case at hand, the Policies both state: "The laws of the State of Issue shown above govern this Policy." Both Policies list Delaware as the state of issue. Thus, if state law is applicable here, it is the law of Delaware.

It has long been settled in Delaware that "[a]ll written contracts . . . are to be read, understood, and interpreted according to the plain meaning and ordinary import of the language employed in them." *Neary v. Phila., W. & B.R. Co.*, 9 A. 405, 407 (Del. 1887); *see also NBC Universal v. Paxson Commc'n Corp.*, No. Civ.A. 650-N, 2005 WL 1038997, at *9 (Del. Ch. April 29, 2005) ("Words in a contract are interpreted using their common and ordinary meaning, unless the contract clearly shows that the parties' intent was otherwise."). Further, under Delaware law, ambiguity exists "if the terms of the contract are inconsistent, or when there is reasonable difference of opinion as to the meaning of words or phrases." *Mell v. New Castle County*, No. Civ.A. 03M-06-030, 2004 WL 1790140, at *3 (Del. Super. Ct. Aug. 4, 2004). Any such ambiguities are construed against the drafter. *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 630 (Del. 2003). "[I]f the insured's reading is reasonable and in accord with her rational expectations as a consumer, the court will give effect to her expectations if the terms of the contract 'are ambiguous or conflicting, or if the policy contains a hidden trap or pitfall . . . .'" *Delmarva Health Plan, Inc. v. Aceto*, 750 A.2d 1213, 1215 (Del. Ch. 1999) (quoting *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 927 (Del. 1982)).

2. If ERISA Does Apply

In the event that ERISA was found to govern the Policies in this case, the question would become whether ERISA rules of construction preempt Delaware law on matters of ERISA plan interpretation. "The Fourth Circuit has held that when interpreting insurance policies under ERISA, courts are to be guided by federal common law rules." *Johnson v. Gen. Am. Life Ins.*

6

*Co.*, 178 F. Supp. 2d 644, 650 (W.D. Va. 2001) (citing *Balthis v. AIG Life Ins. Co.*, 102 F. Supp. 2d 668, 670 n.3 (W.D. Va. 2000), *aff'd*, 246 F.3d 662 (4th Cir. 2001)). While ERISA plainly contains broad provisions preempting state law,[4] that "does not mean that all common law concepts are automatically inapplicable in the ERISA context." *Phoenix Mut. Life Ins. Co. v. Adams*, 30 F.3d 554, 563 (4th Cir. 1994) (citation and quotation marks omitted). In fact, federal courts "may adopt a state law rule as a matter of federal common law without regard for whether it falls within the 'insurance savings clause' as long as it is consistent with the purposes of ERISA." *Jenkins v. Montgomery Indus., Inc.*, 77 F.3d 740, 744 n.4 (4th Cir. 1996) (citing *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1258 (3d Cir. 1993)). Thus, the test is whether a particular construction utilizes "state law to allow a common law action otherwise precluded by ERISA" or applies "a state law concept that modifies an ERISA plan by overriding its explicit terms." *Id.* at 744 (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 57 (1987) and *Adams*, 30 F.3d at 563).

As they relate to the instant case, however, the applicable rules of construction under federal common law are relatively straightforward and do not require gap-filling by state law

---

[4] ERISA contains an express preemption provision that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a). However, ERISA's savings clause "reclaims a substantial amount of ground with its provision that 'nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.'" *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 364 (2002) (quoting 29 U.S.C. § 1144(b)(2)(A)). Then again, the savings clause only applies to state laws that "mandate particular policy benefits" or regulate "core insurance issues" such as the substantive content of policies. *Tri-State Mach., Inc. v. Nationwide Life Ins. Co.*, 33 F.3d 309, 312 (4th Cir. 1994). Indeed, in order for the savings clause to apply, the state law

> must regulate the business of insurance in the sense that the object of its regulation (1) "has the effect of transferring or spreading a policyholder's risk"; (2) "is an integral part of the policy relationship between the insurer and the insured"; and (3) "is limited to entities within the insurance industry."

*Am. Med. Sec., Inc. v. Bartlett*, 111 F.3d 358, 363 (4th Cir. 1997) (quoting *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 743 (1985)); *see also Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 334 (2003) (stating that "a state law must be specifically directed toward the insurance industry in order to fall under ERISA's savings clause [and] laws of general application that have some bearing on insurers do not qualify") (citation and quotation marks omitted).

principles or concepts. In *Wheeler v. Dynamic Engineering, Inc.*, 62 F.3d 634, 638 (4th Cir. 1995), the court held that ERISA plans are to be interpreted "under ordinary principles of contract law, enforcing the plan's plain language in its ordinary sense." Similarly, "[a]lleged ambiguities should be reconciled, if possible, by giving language its ordinary meaning . . . ." *Glocker v. W.R. Grace & Co.*, 974 F.2d 540, 544 (4th Cir. 1992). Generally speaking, language in a contract is ambiguous "if it is susceptible to more than one reasonable interpretation." *Neuma Inc. v. AMP, Inc.*, 259 F.3d 864, 873 (7th Cir. 2001); *accord* Black's Law Dictionary (9th ed. 2009) (defining ambiguity as "an uncertainty of meaning or intention, as in a contractual term . . ."). "In order for an ERISA term to be ambiguous, it must be capable of reasonable interpretations under which the insured is both covered and not-covered; or else create a contradiction on the face of the policy." *Johnson*, 178 F. Supp. 2d at 657. If an ambiguity remains after giving the language its ordinary meaning, it must be construed "against the drafter, and in accordance with the reasonable expectations of the insured." *Wheeler*, 62 F.3d at 638 (citations omitted); *see also Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1451–52 (5th Cir. 1995) (citing other circuits applying this rule in the ERISA context). In *Jenkins*, the court held that even though the insurer was the declaratory judgment defendant, it had the burden of proving that the loss fell within an exclusionary clause. 77 F.3d at 743–44.

Ultimately, whether the Policies in the instant case are governed by ERISA is irrelevant; either way, LINA has the burden of demonstrating that Common Exclusion 6 serves to bar Ms. Weber's claim for AD&D benefits as the beneficiary of her husband's policies. If the meaning of the provisions in Common Exclusion 6 is plain and unambiguous, I must enforce that meaning. Conversely, if the meaning of the provisions is ambiguous, I must construe such ambiguity in favor of Ms. Weber's reasonable expectations of coverage.

8

### C. The Ordinary Meaning of the Language in Common Exclusion 6 is Unambiguous

The Policies—on page 8 of the Basic policy and page 10 of the Supplemental policy—inform the insured that "benefits will not be paid for any Covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from any of the following unless coverage is specifically provided for by name in the *Description of Benefits* Section." Mem. Supp. Pl.'s Mot. Decl. J. Ex. 2, 3. They go on to set out a list of Common Exclusions. In its entirety, Common Exclusion 6, the relevant exclusion in this case, states:

> 6. flight in, boarding or alighting from an Aircraft or any craft designed to fly above the Earth's surface:
>    a. except as a passenger on a regularly scheduled commercial airline;
>    b. being flown by the Covered Person or in which the Covered Person is a member of the crew;
>    c. being used for:
>       i. crop dusting, spraying or seeding, giving and receiving flying instruction, fire fighting, sky writing, sky diving or hang-gliding, pipeline or power line inspection, aerial photography or exploration, racing, endurance tests, stunt or acrobatic flying; or
>       ii. any operation that requires a special permit from the FAA, even if it is granted (this does not apply if the permit is required only because of the territory flown over or landed on);
>    d. designed for flight above or beyond the earth's atmosphere;
>    e. an ultra-light or glider;
>    f. being used for the purposes of parachuting or skydiving;
>    g. being used by any military authority, except an Aircraft used by the Air Mobility Command or its foreign equivalent;

LINA denied coverage pursuant to paragraph 6 and subparagraph 6(a).

Analyzing Common Exclusion 6, Ms. Weber suggests that had the exclusion stopped at subparagraph 6(a), "any reasonable person would understand and expect that only commercial airline passengers [would] be covered in the event of an accidental death" related to a flying accident. Mem. Supp. Pl.'s Mot. Decl. J. 7. However, Ms. Weber contends that the addition of subparagraphs (b) through (g) vitiates any clarity that might have existed up until that point.

9

More specifically, she argues that the additional exclusions in subparagraphs (b) through (g) are superfluous when read in connection with 6(a), and as a result, she maintains they lack import or meaning. Ms. Weber asserts that these subparagraphs were included as a means of further defining the exclusion, but are ultimately irreconcilable with one another. If the drafter had intended the result urged by LINA, Ms. Weber states, it would have stopped with the commercial passenger exception in 6(a). Taken as a whole, though, Ms. Weber believes "[a]ny policy holder could reasonably infer that unless he was involved in one of the activities set out in the subparagraphs (b) through (g), he would be entitled to coverage for a Covered Loss." Mem. Supp. Pl.'s Mot. Decl. J. 9. Accordingly, Ms. Weber submits that Mr. Weber was not involved in activity proscribed by Common Exclusion 6 and that she had a reasonable expectation that his policy would provide coverage for the loss caused by his accidental death.

In *Provident Life & Accident Insurance Company v. Anderson*, 166 F.2d 492, 494 (4th Cir. 1948), the United States Court of Appeals for the Fourth Circuit reversed a district court that had concluded certain language in life insurance policies was ambiguous and had to be construed in favor of coverage. The exclusions in the policies in that case, though not identical, were structured similarly to those in the instant case: the exclusion began with a common phrase, followed by a colon, line-spacing, an indentation, and consecutively numbered clauses, each of which was separated from the other by the space of a line. *Id.* at 495.[5] The court found that the purpose of this arrangement was to insure that the words in the first clause of the exclusion would be read before each of the numbered clauses. *Id.* Thus, "each clause would be a limitation of the coverage of the policy, separate and distinct from the other [ ] limitations." *Id.* In reading the terms of the policy exclusions, the court concluded that there was no ambiguity in

---

[5] The court also stated that the "mere circumstance that all the exclusions are placed in one sentence is not vital as long as no ambiguity is thereby created." 166 F.2d at 496.

10

the operative language of the relevant clause, and because the language was clear, the actionable words were controlling. *Id.*

In this vein, LINA maintains that Common Exclusion 6 effectively functions as seven separate exclusions intended to limit coverage for flight-related claims "in the many-faceted ways in which they might arise or be asserted with limited exceptions to the exclusion of coverage." Mem. Supp. Def.'s Mot. J. on Pleadings 9. LINA notes that the "exclusion plus exception" in subparagraph 6(a) excludes coverage for otherwise covered injury or loss caused by or resulting from "flight in, boarding or alighting from an Aircraft or any craft designed to fly above the Earth's surface . . . except as a passenger on a regularly scheduled commercial airline." The vehicle in which Ms. Weber's husband was flying at his death meets the definition of "Aircraft" as defined in the Policies.[6] Therefore, coverage is excluded under the first part of exclusion 6(a). The second part of exclusion 6(a) following the colon in the first line is an exception to the stated exclusion in the first part. Ms. Weber's husband does not satisfy all of the requirements of this exception. Although he was a passenger in an aircraft, Ms. Weber's complaint indicates that the flight was not one that was regularly scheduled, and that her husband was not a passenger on a commercial airline. Thus, LINA submits, there can be no coverage in this case.

Ultimately, I agree with LINA, and I disagree with Ms. Weber's assertion that the inclusion of subparagraphs (b) through (g) somehow limits or confuses the plan's "exclusion plus exception" found in 6(a). Rather, subparagraphs (b) through (g) stand as additional, independent grounds of exclusion that address plausible factual scenarios not presented in this case. In reviewing the language of Common Exclusion 6, one need not strain in order to reach

---

[6] As defined in the Policies, an "Aircraft" is a vehicle which has a valid certificate of airworthiness and is being flown by a pilot with a valid license to operate it.

this conclusion. For example, the exclusion in 6(b) precludes coverage for a pilot, co-pilot, or flight attendant who otherwise might conceivably fall within the 6(a) exception. In other words, it prevents a crew member on a commercial airliner from claiming he was a "passenger" in the broader sense of that term.

In a related sense, exclusion 6(c) precludes coverage for injury or loss that results from types of aviation that might be deemed "regularly scheduled" or "commercial" under 6(a). Indeed, it is plausible that an aircraft might, for example, be regularly employed by a commercial crop-dusting company such that without the exclusion in 6(c), an injury or loss sustained by a passenger while flying in, boarding, or alighting from that aircraft would be covered. Thus, as LINA has noted, 6(c) precludes coverage on the basis of the type of use regardless of the status of the persons in the aircraft or the nature of the flight.

In exclusion 6(d), it is evident that LINA is forestalling arguments that the base exclusion in Common Exclusion 6 is inapplicable to spacecraft. Such craft arguably do not fit the definition of "Aircraft" or the general phrase "craft designed to fly above the Earth's surface" because such vehicles are designed to pass beyond the bounds of Earth and into space, hence the necessity for an exclusion like 6(d). Further, exclusion 6(d) cuts off claims for future space flight by paying passengers on commercial ventures.

Evidently, the purpose of exclusion 6(e) was to add two forms of transportation to the types of craft excluded from coverage. Such was necessary because as Ms. Weber has herself pointed out, an ultra-light (and perhaps a glider) does not fall within the official definition of "aircraft" as employed by the FAA. Therefore, although use of an ultra-light or glider that resulted in injury or loss might not fit within the base exclusion in Common Exclusion 6, coverage is nonetheless precluded by 6(e).

12

LINA reasonably states that exclusion 6(f) restricts coverage in two ways. First, it works with Common Exclusion 4 to preclude coverage for loss or injury associated with parachuting or skydiving regardless of the point in time during the process where such loss or injury occurs or, for that matter, the role of the insured in that process. Second, like exclusion 6(c), it restricts coverage based on the type of use even though the parachutist or skydiver might occupy the status of "passenger" in the plane and the flight might be deemed part of a commercial enterprise run at regularly scheduled times.

Finally, exclusion 6(g) prohibits coverage for injury or loss incurred by any person in any capacity if the aircraft was in the service of any branch of the military. However, the exclusion does contain an embedded exception for aircraft used by the Air Mobility Command, the department within the military that arranges for the use of commercial airlines to transport military personnel and their families.

Upon careful examination of Common Exclusion 6, I have concluded that the language, despite imperfections in its drafting, is sufficiently clear and unambiguous to permit judgment on the pleadings in Defendant's favor. Although they could stand to be improved grammatically, the subparagraphs are each clearly independent grounds for exclusion applicable to distinct, high-risk factual scenarios. Further, each of these exclusions has a plain meaning and precludes coverage for certain activities that might otherwise not be barred by the basic exclusion and its exception contained in 6(a). Therefore, I disagree with Ms. Weber that the subparagraphs are superfluous, difficult to comprehend, or of doubtful import. Moreover, I have not undertaken a "Herculean" effort to arrive at this conclusion. Not only is the ordinary meaning of the language here apparent, but it is also clear that coverage is unambiguously barred by the base exclusion in Common Exclusion 6, and that this restriction on coverage is not cured by the exception in

subparagraph 6(a). No amount of effort to read ambiguity into the remainder of Common Exclusion 6 can alter that fact.

## IV. Conclusion

For the reasons stated herein, Plaintiff's motion for declaratory judgment in its favor shall be denied, and Defendant's motion for judgment on the pleadings shall be granted.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this __28th__ day of December, 2011.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE